DANIEL F. SULLIVAN, APPELLANT, VS. JAMES N. MORENO, APPELLEE.

1. Upon bill filed and notice of intended application for an injunction, the defendant may at once file his answer, and the rules governing the action of the Chancellor will be the same as those which prevail upon hearing upon bill and answer.

2. The rule in this State anterior to the legislation of 1861, (Chap. 1098, Laws,) was "that where all the equities of the bill are denied by the answer, it is not of course to dissolve the injunction. The granting and continuing of injunctions rest in the discretion of the court to be governed by the nature and circumstances of the case." Under the legislation referred to either party in such case has the right to introduce evidence in support or denial of the bill and the accompanying affidavit or answer, and the Chancellor determines the matter according to the weight of the evidence. The rule stated is modified to this extent. The cases of Carter vs. Bennett, 6 Fla., 236; Linton vs. Denham, 6 Fla., 533, and Allen vs. Hawley, 6 Fla., 142, referred to and followed.

3. In a case where the bill sets up a particular title and the answer in responsive terms denies its existence, and defendant produces a duly certified copy of a deed showing the nature of the title in aid of this responsive denial, the fact that the plaintiff fails to explain the matter or to support his allegation is a circumstance which should have weight with the Chancellor.

4. Where the injury complained of is one arising from the right of property in the soil, such as continued trespasses, amounting to a nuisance or threatened irreparable injury, plaintiff should set up his title in terms clearly showing his ownership.

5. Under the legislation of this State the title to the submerged soil from the channel to the shore is in such riparian proprietor as is contemplated by the act of December 27, 1856. That act to constitute riparian proprietorship requires a water boundary and an allegation by plaintiff that the party through whom he claims title owned and possessed parcels of land "lying on the bay," and that such party had been for thirty years in quiet possession and enjoyment of all the rights of a riparian proprietor, does not constitute a sufficient allegation of riparian proprietorship. "Lying upon the bay" does not necessarily constitute a water boundary, and the exercise of the rights of a riparian owner

does not necessarily make him such owner. Where plaintiff seeks extraordinary relief by injunction on the ground of a particular title, his allegations must be clear and precise as to such title.

6. Simple occupancy and possession of part of the soil between the line of ordinary high tides and the edge of the channel in the navible waters of a bay do not give a right to redress injuries to rights of owners of other portions of this soil not thus occupied. This action is for the true owners of that soil. *Quere :* Whether since the act of 1856, as between grantor and grantee, a simple riparian boundary, as contemplated by the act of 1856, operates by legal presumption to carry the right to the soil to the edge of the channel?

7. The right of free passage in or the navigation of the waters of a port is subordinate to the general commercial interests of such port, and when there is a conflict navigation must yield to commerce. The power of passage upon or navigation of such waters may be destroyed by filling the space before that time occupied by water with material necessary or proper to be used in the construction of structures beneficial to commerce, and such structures are not nuisances, either public or private.

8. Under the laws of this State, wharves, when constructed by a riparian proprietor, are not purprestures, nor are they to be presumed to be nuisances as constituting an obstruction to commerce. They are structures authorized by the sovereign and by law declared to be beneficial to commerce. So also is the deposit of stone or other like material in the waters of a bay from the shore line to the channel authorized by law. All this is, however, subject to the condition that the wharf constructed or the deposit made is to be for the benefit of the commerce of the port.

9. Plaintiff's alleging obstruction to navigation by the construction of a wharf or the deposit of sand in navigable waters of a bay does not make a case of nuisance. Being authorized by law the presumption is that this is for the benefit of commerce, and he should state facts showing the contrary. What is authorized by law cannot be held to be a nuisance upon the assumption that a condition upon which the authority is exercised has not been complied with. From the general allegation that a wharf is being constructed in navigable waters, the presumption is that such wharf will be beneficial to commerce and is not injurious to commerce or a nuisance.

Appeal from the Circuit Court for Escambia county.

The following statement of the case was prepared by Mr. Justice Westcott:

James N. Moreno, through his bill in chancery against Daniel F. Sullivan filed on the 8th day of March, A. D. 1882, alleges that "Francisco Moreno for more than thirty years has owned and possessed the parcels of land lying on the bay of Pensacola, between Barracks street and Adams street in the city of Pensacola, the said Moreno having been for all that time in quiet possession and enjoyment of all the rights of a riparian owner until the defendant and others, without any right or authority, wrongfully entered into possession of certain portions of the front of said property out in the waters of Pensacola bay; that for many years plaintiff has been in quiet possession as owner by certain mesne conveyances from said Francisco Moreno of a wood and coal yard on the beach and property of said Francisco Moreno, and has enjoyed the privilege of ingress and egress to and from his said coal and wood yard by the navigable waters of Pensacola bay for vessels, boats, rafts and other floatage whereby he has and still transports large quantities of wood, &c., to his said wood and coal yard."

Plaintiff then makes reference to a plat which he makes an exhibit to his bill, and which he prays may be taken as a part thereof.

He says that by "the wharf built and maintained by defendant upon what is represented as the extension of Barracks street he (plaintiff) is entirely excluded from egress and ingress to and from his said wood yard, westward of which, if restricted to its proper lines, he cannot and does not complain, but the defendant, entirely disregardful of the rights of the whole world to use the navigable waters of Pensacola bay as a public highway, and especially of the rights of your orator to use them as a highway to and from his premises, has extended, and still is extending,

his structures and obstructions to navigation far to the east-ward of the extended lines of Barracks street within which said wharf should be confined ; that as is shown by said plat and will appear upon view he has extended and is extending his obstructions eastward to and across the extension of Adams street upon which one John Lear has authority, and is, as your orator is informed, about to build a wharf still further to the eastward to and across the lines of the extension of Alcanis street upon which John Callaghan has authority, and is now building a wharf; that said defendant's obstructions extend eastward within a short distance of Barkley's point, a point extending far out and greatly shallowing the waters of the bay to the east of the obstructions already placed in and now being placed in the navigable waters of said bay east of the extension of Barracks street so that even now, before the full occupancy of the extension of Adams and Alcanis streets by wharves, the public, and especially your orator, is almost entirely excluded from the public highway over the navigable waters of Pensacola bay east of Barracks street to beyond Alcanis street ; that said defendant is now engaged, regardless of your orator's oft-repeated objections and protests, in erecting a cross wharf from Barracks street wharf eastward across the extension of Adams street to and across the wharf being built by said Callaghan, he having already driven piles therefor and threatens to fill in with ballast, sand, &c. ; that defendant has put and is putting into the navigable waters of the bay to the eastward of said Barracks street wharf large quantities of rock and sand and other materials to permanently obstruct navigation in and upon the navigable waters of said bay, and if not restrained will almost entirely exclude navigation in the waters of Pensacola bay between the extension of Barracks street and Barkley's point, and will absolutely, permanently and

irreparably exclude navigation between Barracks street wharf and Alcanis street wharf, and will thus perpetuate the public nuisance of which he is already guilty, and will render your orator's wood yard entirely inaccessible by the navigable waters and the great public highway of Pensacola bay."

*WATERS OF PENSACOLA BAY.*

The above diagram shows the location of the points named in the bill and the wharf obstruction proposed to be constructed by the defendant. The locality of Barkley's point mentioned in the bill does not appear upon the plat filed.

Plaintiff alleges that special and irreparable injury will result to him unless the defendant is required to abate said alleged nuisance and remove all obstructions he has put in the navigable waters of Pensacola bay east of the extension of Barracks street.

Plaintiff prays that the defendant may be enjoined from placing any earth, sand or stonein or in any wise obstructing the navigable waters of Pensacola bay east of the extended lines of Barracks street obstructing navigation to and from his wood yard, for a mandatory injunction directing the defendant to obviate, abate and remove the nuisances, impediments and obstructions already placed by him in the navigable waters of the bay east of Barracks street so as to render plaintiff's use of the waters as full and complete as it would be but for such obstructions, and for general relief.

Plaintiff on the 25th March gave defendant notice that he would on the 4th of April, A. D. 1882, move for an injunction as prayed for in his bill. On the 3d of April, A. D. 1882, the defendant filed his answer.

Defendant admits that Francisco Moreno has been in possession of and claimed title to lots known in the Spanish plan of the City of Pensacola as lots I. and H., and that said lots are situated between Barracks and Adams streets, and are the lots in respect to which complainant asserts riparian rights, but denies that said lots do now or ever did extend to the ordinary high tide mark of Pensacola bay, and affirms that said lots are now and always have been bounded on the south by a public way, street or

common lying between the south boundary of said lots and the shore line of Pensacola bay.  What purports to be a copy of the Spanish plan of the city, so far as necessary to the location of said lots with reference to the bay and city and line of high tides, is filed as an exhibit to the answer. From this it appears that a street or common intervenes between the south boundary of lots I. and H. and the ordinary high water mark of the bay.  Defendant further says that it is not true that Francisco Moreno ever owned any part of the soil south of the south line of said lots I. and H. as defined upon said plan ; denies that Francisco Moreno ever could have, by reason of his said ownership of said lots I. and H., any riparian rights into or upon the bay shore or the submerged land in front thereof, and affirms that the land occupied by the plaintiff's wharf and wood yard is on soil belonging to the public as a public way, street or common on submerged land adjacent to said public way, street or common, and in proof thereof defendant files a certified copy of the deed by which said Francisco Moreno acquired title to that part of lot H., in front of which plaintiff's wharf and wood yard are situated.   This exhibit is a deed from Benj. D. Hassell to Francisco Moreno.   It is dated April 10, A. D. 1841.   It recites the land conveyed as " all that certain lot and half lot of land situated, lying and being in the City of Pensacola adjoining the Tivoli House (commonly called), and bounded on the eastern side by a lot known on the plan of the said city as Hospital lot, on the south by the street on the Pensacola bay, on the north by the Tivoli street, and west by the lot commonly called the Tivoli lot, containing one lot and a half lot agreeably to the plan of said city, which said lot and half lot is the eastern part of the lot known upon the plan of said city as lot H., containing one hundred and

twenty-five feet front on Tivoli street and one hundred and thirty-six 6-12 in depth."

Defendant alleges that the said wood yard is a continuing trespass on said public way and the submerged land appurtenant thereto; that the yard was built and established several years after the defendant's boom and wharf were built and established; that defendant's wharf at the foot of Barracks street was built under a charter from the City of Pensacola to meet the wants of commerce; that it does not deflect from the line of Barracks street until after it reaches the channel in 12 feet water, and that its deflection was necessary for the accommodation of ships and other vessels, and that it was made and built and has been continued without complaint or objection from said city or any individual until plaintiff's complaint, and that it has been built and maintained at great expense for a period of nine years, and for that period adversely and actually possessed and managed by defendant as a public wharf against the claims of any person asserting rights adversely thereto. Defendant further says that his timber boom was built in 1873, and has since been actually possessed, used and maintained adversely to all persons claiming riparian rights, complainant and his assignors amongst the rest, if they ever did assert any rights against the respondent; that during the time the said boom was built one Stephen A. Moreno held a conveyance from said Francisco Moreno for all the riparian rights and privileges now claimed by complainant; that after the construction of said wharf and boom as aforesaid the said Stephen A. Moreno, on the 13th September, A. D. 1876, re-conveyed whatever riparian rights and privileges he had in front of said lots I. and H. to said Francisco Moreno, who afterwards, on the 14th of October, A. D. 1876, made a like conveyance of said riparian rights and privileges to complainant, and that thereafter, on the

26th of April, A. D. 1878, complainant caused an action of ejectment to be instituted in the name of said Stephen A. Moreno against this respondent on the law side of this court to recover this respondent's said wharf and boom, which said action is still pending and undetermined, and respondent submits whether, pending this suit at law and until complainant has thereby established his asserted riparian rights, he has any claim to the relief he asks in his bill.

Defendant further says that he is not extending his timber boom beyond the wharf of said John E. Callaghan, but that said Callaghan is, without complaint from plaintiff, so far as he is informed, constructing a wharf from the front of Alcanis street, on which said wharf the eastern portion of defendant's boom abuts, and this respondent alleges that it is said Callaghan's said wharf which prevents vessels from coming to complainant's wharf, for that before the building of said wharf there was ample room and water for all crafts coming to complainant's wharf, and any like wharf north of respondent's boom; and that to all such craft the space north of said boom furnishes a safe and convenient harbor in which they could lie in smooth water.

A hearing of the motion for an injunction was had on the first of May, A. D. 1882, upon bill and answer, and the court enjoined defendant, until the further order of the court, from further depositing or placing earth, sand, stone or any other material in the navigable waters of Pensacola bay east of the extended line of Barracks street so as to form obstruction to navigation of said waters and from anywise further obstructing said waters, as complained of in plaintiff's bill.

The defendant now appeals to this court from this order, and the grounds of appeal set forth in his petition of appeal present for our consideration this interlocutory order for an injunction in all of its aspects.

*John A. Henderson* for Appellant.

The case made by the bill is in effect that appellee is entitled to riparian rights under the laws of Florida, (McClellan's Dig., p. 690;) that in the exercise of those rights he built a wharf and established a wood and coal yard.

And as the owner of such wharf and wood and coal yard irreparable injury has been and continues to be done to him by appellant by the construction of a wharf and a timber boom, of which diagram is given in an exhibit.

The answer denies all riparian rights to the appellee and those under whom he claims, and alleges responsively to the bill—

That appellee's wharf, wood and coal yard are on a way, street or common in front of lots H. and I.

That those lots to which riparian rights are claimed to be incidental are not bounded by Pensacola Bay, as appears by a copy of so much of a map of the City of Pensacola as represents these lots and their surroundings, which copy is made a part of the answer.

That in the very deed, (a certified copy of which is made a part of the answer,) by which appellee's grantor acquired titles to that portion of lot H., in front of which appellee's wharf is situate, said lot is described as bounded on the south " *by a street fronting on the Pensacola Bay.*"

That appellant has held and possessed the structure of which the bill complains adversely to all persons for more than seven years, and that appellee's wharf and coal and wood yard were erected subsequently to appellee's wharf and timber boom.

And that an action instituted at the instance of appellee for recovery of *those structures*, which he *claims* as *riparian owner*, is still pending and undetermined in this court.

Appellee's claim to relief by injunction depends entirely

upon his asserted riparian rights being well founded and long established. Gardner vs. Newbury, 2 John. Ch. R., 162; Porter vs. Williams, 17 Maine, 292; State vs. McGlynn, 20 Cal., 233.

The answer and its exhibits positively contradict the existence of such rights.

Appellee's claims, as made by the bill and answer and exhibits, are concluded by Alden vs. Pinney, 12 Fla., 348.

Like lot E. in that case so are lots H. and I. in this one, bounded by a south line and street cutting them off from the bay. The lines of lot E., as they appear on the city maps, were declared conclusive of the boundary of that lot.

The lines of lot H. and I. are as distinctly defined on that map as those of lot E. could have been, and their south line is far removed from the water, leaving a wide space between ordinary high tide mark and that line.

The court so held in Alden vs. Pinney, although Pinney's deed called for "90 feet in front on the bay," the court holding that "90 feet front on the bay" indicated aspect; but if not that the lines of the city maps controlled the words.

But in this case the very deed under which F. Moreno, the grantor of appellee, acquired title to that portion of lot H., in front of which appellee's wharf, &c., is situate, coincides with the city maps in making "the street fronting Pensacola Bay" the southern boundary of the lot.

If appellee's grantor under that deed could take nothing south of the north side of "the street fronting on the Pensacola Bay," could convey nothing beyond that line to appellees.

If Hassell had any rights south of "the street on Pensacola Bay," he certainly conveyed none of them to appellee's grantor, at least no such conveyance is set up.

The question made by the bill and answer regards ex-

clusively appellee's riparian ownership, and if he has no such ownership he cannot stand upon his bill.

Even if appellee had any riparian rights they would be barred as against appellant by the latter's adverse possession for more than seven years.   Sanford vs. Cloud, 17 Fla., 557.

But the court below founded its order not upon appellee's riparian rights, but upon his naked possession of a wharf, wood and coal yard.   A possession *junior*, too, to that of appellant in his wharf and timber boom.   I submit—

1. The bill makes no such case as that upon which the order was made.   It presents a case bounded upon a claim of riparian rights exclusively, and no such rights are shown to exist in appellee.

2. But even the case assumed by the court does not warrant the order.   The alleged injury upon which appellee grounds his claim to relief is as to his rights as a wharf proprietor.

The primary question upon which the case was made by the court below must rest is, What right had appellee to establish and maintain his wharf?

Not being a riparian owner, and the soil upon which his erections stand being public property, he can only justify that possession by authority from the State.   But no such authority is asserted or pretended.

It follows that the erections of appellee are purprestures on the very same public property on which the complained of purprestures stand or are situate.

If appellee can enjoin appellant in respect to the latter's purprestures because the former's access from the bay to the wharf is thereby cut off, why may not the latter enjoin the former on account of his purprestures because the latter's access from his boom to the shore is thereby cut off?

The case resolves itself into a complaint by one wrong-doer against a like wrong-doer about the same public right.

But even from this point of view appellant stands upon the vantage ground because he is the senior purpresture, the answer showing that his wharf and boom were erected long before appellee's wharf, wood and coal yard. In such case the maxim, *in equalis jure melior est conditi possidentes*, must prevail.

The case as it appears would be like that of Corning vs. Lawson, 6 John. Ch., 439, if in that Corning, instead of being on lot owned *on* Vesey street, had built a house *in* Vesey, and afterwards applied for an injunction against Lawson for having obstructed the street by a previous erection. Would Chancellor Kent have granted an injunction in such a case?

The case assumed below, and upon which the restraining order was made, can in no sense be ancillary to the pending case at law. For in the latter appellee is asserting his ownership of appellant's erections, whilst in the latter he is made to denounce them as a public nuisance and to demand their suppression.

The order and the writ by their vague and indefinite terms contravene the rule that "the writ of injunction should contain a description of the particular thing or acts concerning which the defendant is enjoined, in order that there may be no opportunity for misapprehension." High on Injunctions, Sec. 39.

They prohibit appellant from doing not merely what may interfere with the approach to appellee's wharf, but from *doing anything of which his bill complains*, whether especially referring to his rights or only to the rights of the public. It would seem that under the above cited rule the order of the court, and not the bill, should be the guide to the required obedience of appellee's suit.

They exclude appellant from making any improvements on Pensacola bay east of Barrack street, no matter how dis-

tant.  If the appellant should be, as he actually is, the assignee of a charter for a wharf at the foot of Adams' street, the construction of that wharf might be treated as a violation of the injunction, upon a strict construction of the terms of the order.

*E. A. Perry* for Appellee.

It appears by the answer or affidavit of Sullivan that there is a suit at law pending to determine the title to the soil between the parties.  So, even if the question of Moreno's title to the soil upon which Moreno's wood yard is situated were material, the Circuit Court rightly exercised its discretion in granting the temporary injunction and in granting its aid to stay irreparable mischief; it properly and of necessity was bound by this court's decision conveyed in the following language: "If the thing sought to be restrained is in itself a nuisance, and it so appears from the facts set forth in the bill, the court will give its aid to stay irreparable mischief and will grant a temporary injunction, in the first place, until the parties can have a hearing at law."  Thebaut & Glazier vs. Conova, 11 Fla., 143, 168, 169, 3d Daniel's Chan. Practice, 1850, & Notes ; Earl of Ripon vs. Hobart, 3 Mylne & Keen, 169, 180.

It is here alleged in the sworn bill, and not denied by the affidavit of defendant, that the thing sought to be restrained is the obstruction to navigating the public highway, the Bay of Pensacola, which is clearly in itself a nuisance, and the court rightly gave its aid to stay irreparable mischief, and granted a temporary injunction without waiting for the determination by law of where the title to the ground may be.  The ownership of the soil in whomsoever it may be is subject to the paramount right of all the world to use the navigable waters over it as a public highway.  Alden vs. Pinney, 12 Fla., 348, 391.

The thing here sought to be restrained being, as alleged in the bill and not denied, an unauthorized structure in and encroachment upon the navigable waters of Pensacola bay, is a public nuisance, *per se*, whether or not it produced any public injury. People vs. Vanderbilt, 26 N. Y., 287 ; Wood's Law of Nuisances, 653, and the numerous cases cited in note 1.

But the question of legal title here is in no wise involved, for while it is a general rule that the plaintiff must prove his right: " If the injury is merely to a possessory right, (or use) possession (or use) alone need be proved." Anonymous, 1 Vent., 264 ; Winford vs. Wallaston, 3 Lev., 266 ; Coryton vs. Lytheybe, 2 Saund., 114 ; Tenant vs. Goldwin, 1 Salk., 360; Reg. vs. Bucknell, 2d Ld. Raym., 804; Wood's Law of Nuisance, p. 882, §843.

And possession alone is title, and he who hath such title can hold against every one but him who hath a title superior to it. Fisher vs. Philadelphia, 75 Penn. St., 392.

Take the case of Lutterloh vs. Mayor & Council of Cedar Key, reported in 15 Fla., 306. Would this court have held that one residing upon an adjacent lot could have had no aid from a court to prevent the obstruction of the street until he had established a perfect legal title, good against all the world, to his residence ?

In this case, whether or not Moreno may eventually defend his right to the soil upon which his wood yard is situate, as against all the world, he is in the quiet and undisturbed possession and use of the same, and his possession and use are being irreparably and specially injured by the public nuisance complained of; and he has the same right to the court's aid to protect his possession and use against an acknowledged public nuisance as to protect his title in the event he establishes his title to all the water front in the suit at law pending.

In granting temporary injunctions the court in no manner is called upon to anticipate the ultimate determination of rights involved; its purpose is to preserve the property or rights *in statu quo*, until a satisfactory hearing upon the merits, without expressing and indeed without having the means of forming an opinion as to such rights, and in order to sustain such an injunction for the protection of property or rights, *pendente lite*, it is not necessary to decide in favor of complainant upon the merits, nor is it necessary that he should present such a case as will certainly entitle him to a decree upon the final hearing. 1 High on Injunctions, p. 6, §5.

The granting of a temporary injunction is a matter peculiarly within the discretion of the court upon a consideration of all the circumstances.

And when granted upon a proper bill, duly sworn, the Appellate Court will in every case be slow to hold that such discretion has been wrongfully exercised, especially when, as in this case, the Judge who has granted the temporary injunction, has by the bill been invited to view the premises and is presumed to be more familiar with all the circumstances than can be a court far removed from the locality and consequently less familiar with the circumstances that have induced the granting of the preservative writ.

It seems clear that however this case may be viewed, the action of the Circuit Court must be affirmed.

The thing restrained is a public nuisance. As such it peculiarly and especially affects Moreno, whether it be considered as an injury to the estate, the title to which is now being litigated in the Circuit Court, and in that view the rights of the parties are properly preserved in *statu quo*, until trial of that right; or whether it be considered as only affecting and injuring his possession and use of the premises which he occupies, to which no one claims any title as against him.

It seems, even if it were necessary that Moreno's title to the soil, upon which his wood yard is situated, should be established beyond controversy, it could not be done except by the suit at law pending, could not be done by the Equity Court; consequently it would be proper for the Equity Court to use its power to preserve the respective rights of the parties until the termination of the suit at law.

And if the title was involved and could be determined by the Court of Equity, the exhibit filed by the defendant would have but little weight in the mind of a court to controvert Moreno's sworn allegation of ownership. His title might well emanate from other sources than from the maker of that deed; might result from long possession; and would not necessarily be restricted by the description of any one deed to him, or by what may once have been a passage-way or street, but by long non-user may have been closed, or by changes from accretion or avulsion may have been carried far inland or seaward from its original location. These are matters peculiarly within the knowledge of the Judge, who has spent the greater part of his life in view of the premises, and, in view of all the circumstances, exercised his discretion in granting the temporary injunction to preserve all rights in *statu quo*.

These, however, are questions not involved in this proceeding, though they, or some of them, may figure in the suit at law between these parties.

"Treating the power of granting interlocutory injunctions, as resting in a sound judicial discretion, the courts of appellate jurisdiction are averse to any interference with the exercise of that discretion. And to such an extent is this aversion manifest that it may be stated as a general rule prevailing in States where appeals are allowed from orders granting or refusing injunctions *in limine*, that the appellate or reviewing tribunal will not interfere with or

control the action of the court below in such matters, unless it has been guilty of a clear abuse of that discretion ; and by abuse of discretion, within the meaning of the rule, is meant an error in law committed by the court. Unless, therefore, some established rule of law or principle of equity has been violated, the action of the court below will not be interfered with upon such an appeal.

" Nor will the Appellate Court, upon such an appeal, ordinarily revise or control the discretion of the court below, upon questions of conflicting evidence, when, after hearing such evidence, that court has granted or refused a preliminary injunction." 2 High on Injunctions, §1696, and authorities cited in notes ; among other cases Patterson vs. Board of Supervisors, 50 Cal., 344 ; Moses vs. Flewellen, 42 Ga., 386 ; Bonaud vs. Genese, ib., 639 ; Smith vs. Maganrich, 44 Ga.; 163 ; Oberholen vs. Greenfield, 47 Ga., 530.

The court below having so exercised its discretion as to properly preserve the rights of all parties concerned, and agreeably to law in such cases as laid down by this court, the action of the court below should be affirmed with costs.

*J. P. Jones* on same side.

1. When it appears that a person will sustain any *special* or *peculiar* damage in consequence of the obstruction of a public highway, an injunction to restrain such obstruction will be granted at his suit. (Dawson vs. The St. Paul Fire In. Co., 15 Minn., 136.) The bill alleges special and peculiar damage to appellee, Moreno, and is not denied by answer, but sought to be avoided by ignoring Moreno's possession and disputing his title. See bill and answer.

2. In Glascott vs. Lang, 3 Myl. & Cr., 455, Lord Cottenham says : " In looking through the pleadings and evidence for the purpose of an injunction, it is not necessary that the court should find a case which would entitle the plain-

tiff to relief at all events. It is quite sufficient if the court finds, upon the pleadings and upon the evidence, a case which makes the transaction a proper subject of investigation in a court of equity."

In the Great Western R. Co. vs. Birmingham, etc., R. C., 2 Ph., 602, the same learned Judge says: " It is certain that the court will, in many cases, interfere and preserve property in *statu quo* during the pendency of a suit in which the rights to it are to be decided, and *that* without expressing, and often without means of forming, any opinion as to such rights, * * * seeing that there is a substantial question to be decided, it will preserve the property until such question can be regularly disposed of. In order to support an injunction for such purpose it is not necessary for the court to decide upon the merits in favor of plaintiff."

In Shrewsbury & Chester vs. Shrewsbury & B. R. Co., 1 Sim. N. S., 410–426, the Vice-Chancellor says " that there are two points on which the court must satisfy itself: First, it must satisfy itself not that the plaintiff has certainly a right, but that he has a fair question to raise as to the existence of such a right. The other is whether *interim* interference on a balance of convenience or inconvenience to the one party and to the other is or is not expedient." And see also to the same point Tonson vs. Walkers, 3 Swans., 679 ; and see also High on Injunctions.

" In order to support a motion for an injunction the bill should set forth a case of probable right and a probable danger that the right would be defeated without the special interposition of the court." (Per Johnson J. in Georgia vs. Brailsford, 2 Dall., 402.) Blair J. says in same case : " It is enough on a motion of this kind to show a colorable title." Id., 407.

All, it seems to me, that the Judge should require upon the preliminary application is a case of probable right, and

probable danger to that right without the interposition of the court; and such a case, we respectfully submit, was presented to his Honor, from whose decision an appeal is taken, and we ask an affirance of his decree with costs.

Mr. Justice Westcott delivered the opinion of the court.

From the preceding very full statement of this case it will be seen that it is one in which the plaintiff, as an alleged riparian proprietor, seeks to enjoin the defendant from constructing a wharf and from depositing stone, sand and other material immediately in front of property alleged to be his, and, we presume, between it and " the edge of the channel " of the bay of Pensacola.

Anterior to the act of 1856, Chapter 791, Laws of this State, the title to the soil of navigable tide waters to the line of ordinary high tides was in the State of Florida, subject to the powers of Congress in the matter of regulating commerce under the Constitution of the United States. This, as a legal proposition, has been admitted as settled since the case of Pollard's Lessee vs. Hagan, 3 How., 299.

In 1856, under an act of the Legislature, the State of Florida divested itself of all right, title and interest to all lands covered by water lying in front of any tract of land owned by a citizen of the United States lying upon any navigable stream or bay of the sea or harbor as far as to the edge of the channel, and vested the full title to the same in the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce.;

and upon lands so filled in to erect ware-houses or other buildings. The riparian proprietor was also given the right to prevent encroachments of any other person upon all such submerged land in the direction of their lines continued to the channel " by bill in chancery or at law, and to have and maintain action of trespass in any court of competent jurisdiction in this State for any interference with such property." The act provides further that the grant therein contained shall not be so construed " as to release the title of the State of Florida, or any of its grantees, to any of the swamp or overflowed lands within the limits of the same, but the grant therein contained shall be limited to those persons and bodies corporate owning lands actually bounded by and extending to low water mark on such navigable streams, bays and harbors."

This statute and the rights resulting to riparian proprietors was, to some extent, considered in the case of Alden and Wife vs. Pinney, 12 Fla., 348, and the case of Rivas & Koopman vs. Solary, 18 Fla., 122. In the first case we held that the evidence failed to show that the complainant, or those whose title and right he claimed, had a water boundary in 1856, and that it was immaterial to inquire whether the rights granted by the State enured to any other than one, in the words of the statute, " owning lands actually bounded by and extending to low water mark." In other words, whether the owner to the line of ordinary high tides was embraced in the statute. In the second case each of the parties claimed through a common source of title, and it was admitted that the parties through whom they claimed held to low water mark. In the first case we also held that if plaintiff had shown himself a riparian proprietor, there would have been such existing and threatened injuries of a special nature, coupled with other circumstances, that he would have been entitled under the statute to the aid of

a court of equity to prevent special injury to himself, but that not having such proprietorship he did not present a case of special injury, independent of riparian ownership, calling for the intervention of a court of equity.

As to the present case, the plaintiff presents it here in two aspects: First, as an alleged riparian proprietor; and, second, as a possessor of the submerged land; either of which, it is claimed, entitles him to the interference of a court of equity in his behalf.

Looking to the allegations of the bill and the denials and their nature made in the answer, we do not think, under the rules controlling applications for special injunction upon bill and answer to stay irreparable injury in case of repeated trespasses or nuisances, that the Chancellor could porperly have acted upon the hypothesis of riparian ownership in plaintiff, either to ordinary high tides or to low water mark. What is the rule in such cases? " Upon the filing of an injunction bill the defendant may, at his option, immediately put in his answer to prevent the issuing of the writ, and the court is bound to consider such answer and give it due weight if filed before the application for the injunction is disposed of." The rule, as thus announced, is not very definite, as what constitutes "due weight" is a matter still left open for controversy.

After a careful examination of the cases bearing upon the subject we think in cases where the bill justifies an injunction, the rule is the same. as that which prevails upon motion to dissolve an injunction upon the coming in of the answer. Chancellor Bland discussing this subject in Hall vs. McPherson, 3 Bland's Chancery, 532, says: " If a defendant should hear of such a bill " (bill for injunction) " being on its way to the Chancellor it does not seem to me that there can be any sound regulation which should hinder him from following the bill to the tribunal and instantly

presenting his answer so as to prevent the imposition of the threatened restriction. An injunction may be dissolved on the coming in of an answer which positively denies all the facts upon which the equity of the bill is founded; hence it would be strange indeed to refuse to look at such an answer presented together with the bill and to grant an injunction which must soon and inevitably be dissolved. I am, therefore, of the opinion that this answer must be now read and considered." The rule in cases of motions to dissolve an injunction upon bill and answer has been frequently stated in this State. The leading case upon the subject is that of Carter vs. Bennett *et al.*, 6 Fla., 236. In that case the court say: " We believe it to be the almost universal practice that if the answer fully denies *all the circumstances* upon which the *equity is founded*, credit is given to the answer and the injunction dissolved." This practice, however, is not without exceptions. Chanceller Kent in Roberts vs. Anderson, 2 John. Chy. Rep., says: " That even where all the equity of the bill is denied by the answer it is not of course to dissolve the injunction; as the granting and continuing an injunction rests always in the sound discretion of the court to be governed by the nature of the case." (See also Linton vs. Denham, 6 Fla., 533 ; Allen vs. Hawley, 6 Fla., 142.) We must consider this as the rule now controlling in this State, except to the extent that it is modified by the provisions of Chapter 1098, laws enacted since the decisions of the cases cited under which the parties are authorized in cases where the " defendant in his answer shall have denied the statements of the bill or of the accompanying affidavit, either party thereto shall have the right to introduce evidence in support or denial of the bill and accompanying affidavit or answer." In which case his action must be controlled by the " weight of the evidence." For a very extended and able discussion of the

matter of receiving and reading affidavits after answer, where an injunction is sought to be dissolved in cases of alleged or irreparable injury, see the opinion of Judge Story in Poor vs. Carlton, 3 Sum., 70. In this case no such "evidence" was introduced. The case stood upon bill and answer and exhibits constituting a part of the bill or answer. At the same time the right of the plaintiff to present such evidence must be remembered, and the non-exercise of this right, if the circumstances called for it, must have its influence.

In view of the rule announced, should the Chancellor in this case have acted upon the supposition of riparian proprietorship in the plaintiff?

Plaintiff alleges that Francisco Moreno, the party through whom he claims title, had for more than thirty years owned and possessed the parcels of land lying on the bay of Pensacola between Barracks street and Adams street, the said Moreno having been for all that time in quiet possession and enjoyment of all the rights of a riparian owner. This is by no means an accurate statement of riparian ownership. This party may have owned lands lying on the bay of Pensacola in the sense of aspect, and he does not say here that the bay was his boundary. If he owned lands some distance from the line of high tides or " low water mark," with no intervening obstacle or structure, it can be said that it was property " lying " upon the bay. . What constitutes riparian proprietorship is a water boundary either at high or low tide as may be the law, and a statement of boundary of such indefinite character, when the matter of boundary is of essential importance and so readily stated, is not sufficient to base an application for an injunction upon. The claim which the plaintiff makes, viewed in the aspect in which we are now treating it, is based upon title to the *locus in quo*, and the rule in cases where an injunction is sought to re-

strain a nuisance on the ground of special private injury to property is that the bill must set out the title clearly. Granting injunctions to stay waste upon similar ground of alleged irreparable and continuing injury in cases not arising out of privity of contract or title, but between strangers, is governed by rules not more strict as to the matter of distinct and clear allegations of title than is the granting of injunctions to stay continuing trespasses or injuries to property through a nuisance operating to hinder and defeat the legitimate use of such property by the owner thereof. De Sallis vs. Crosson, 1 B. & Beat., 188 ; Eden on Inj., §233.

In order to obtain injunction to stay waste the particular title must be set out. (Whiteleg vs. Whiteleg, 1 Brown's Chancery Reports, 57.) Nor will the court entertain a motion for an injunction in the nature of a writ of estressment, (which was a writ issuing from a court of law to stay irreparable injury pending a real action, 1 Bland's Chancery, 574,) except when the allegation of title is clear and particular. Note to Whiteleg vs. Whiteleg, 1 Brown's Chancery Reports, 57, and cases there cited ; Davis vs. Leo, 6 Ves., 787 ; Daniell's Chy. Prac., Cooper's Ed., 1669.

For the reasons given and from careful examination of the cases controlling the subject we think a statement of the ownership of land between two streets which run to the bay, and as lying upon the bay, is not such a statement of ownership as necessarily imports a water boundary, and that the bill is wanting in particularity in allegation in this respect. Lying upon the bay does not necessarily mean bounded by the bay. Again plaintiff alleges that the party through whom he claims title had for thirty years been in quiet possession and enjoyment of all the rights of a riparian owner. This upon its face is not an allegation of riparian ownership. It is simply that the rights of such an owner were exercised by this party, and this is perfectly

consistent with the position of a squatter without color of title exercising the rights of the true owner without being such. An allegation of ownership of lands lying on the bay and enjoyment of all the rights of a riparian owner is not an allegation of ownership of land having a water boundary, either to the line of high tides or to low water mark. But however this may be, looking to the rules controlling the matter upon the hearing upon the bill and answer, we cannot doubt that the injunction should have been denied. We have seen that the plaintiff claims title through Francisco Moreno. He is thus particular and special in stating the source of his title. The answer not only denies in responsive terms that this party was even a riparian proprietor, but the defendant affirms that Francisco Moreno owned lots I and H, as marked on the Spanish plan of the city; that these lots are the lots as to which complainant asserts riparian proprietorship, and that "said lots are now and always have been bounded on the south by a public way, street or common lying between the south boundary of said lots and the shore line of Pensacola bay." What purports to be a copy of the Spanish plan of the city showing the location of the lots is given with the answer, and the statement of the defendant corresponds with the boundaries thus given. In addition to this defendant produces a certified copy of the deed under which he alleges Francisco Moreno claimed title. The southern boundary is in that given as being " on the south by *the street* on Pensacola bay," and it is apparent from it, and the allegations of the answer in reference to it are, that a street does thus constitute the southern boundary. With a bill thus uncertain in its allegations, and an answer thus explicit and responsive, no action based upon riparian ownership should have been taken. Especially is this true when the plaintiff fails even to respond to all this by an affidavit showing his right. This

non-action is almost equivalent to an acquiescence or confession.

In this view of the case we think the action of the court, if based upon riparian ownership, was not sustained.

What is here said upon the question of nuisance and the allegations of the plaintiff upon that subject may be very properly read in this connection.

It remains only to consider the claim which the plaintiff makes by virtue of his occupancy of a portion of the water front by his wood and coal yard and the wharf which he has constructed a short distance from them out into the water. Plaintiff insists that "possession alone is title, and he who hath such title can hold against every one but him who hath a title superior to it." This is unquestionably law, (Seymour & Simpson vs. Creswell, 18 Fla., 39, 40;) but we do not see in this case any interference by defendant with plaintiff's possession of his yard or wharf, or with any right incident to such possession. Defendant's structures are some distance in front of the occupancy of plaintiff. A. in possession of one piece of land cannot be said to be interfering with the possession of B. if the land occupied by B. is not the same land. This is not, however, the claim which the plaintiff makes here. What he claims is a right to the use of the water in front of his yard and wharf, and that by virtue of his occupancy or possession of such yard and wharf. The title to all this soil from the water line to the edge of the channel, with the right to fill it in with stone or other material, which he may see proper to use in the construction of structures beneficial to commerce, is in the riparian proprietor of 1856 or his grantee, whoever he may be, (Rivas & Koopman vs. Solary, 18 Fla., 126,) and a subsequent simple possession by the plaintiff, even if it be adverse, would not give him any right beyond that of possession of the place actually occupied by him as against

one not having a better title. Under that act the title to the soil vested in the then riparian proprietor, coupled with the trust to use it for the benefit of commerce, and a subsequent simple occupancy of such portion of the land by another person as gave the original proprietor the riparian right, would be limited in its effect to rights attending actual occupation of land. Whether as between grantor and grantee, a riparian boundary, in the absence of contrary intention shown, carries by legal presumption the right to the soil to the edge of the channel, (Valentine vs. Piper, 2 Pick., 94,) such a presumption as operates in a highway boundary to carry the fee to the centre of the highway, we do not say, for it is not here necessary to decide that question. What we do say is that simple occupancy and possession of part of the soil between the lines of ordinary high tides and the edge of the channel does not give a right to redress injuries to anything beyond that which is in actual occupation. Here the right to prevent the construction of this wharf is in the riparian proprietor. It is not in one who is simply occupying a different and other part of the soil between the wharf being constructed and the shore line. The right to prevent the construction of wharves here by a stranger is incident to the ownership of the soil upon which they are to be constructed.

As to the matter of nuisance or no nuisance—

The plaintiff in his bill alleges generally that the structures and deposits complained of are in the navigable waters of Pensacola bay, but what their relative position is with reference to the edge of the channel is not given. Nor are there such statements of fact as show their effect upon the general commerce of the port to be injurious. The defendant says in his answer that the wharf extends along the channel in twelve feet water, and that the deflection eastward from the line of Barracks street was necessary for the

accommodation of ships and other vessels. The argument here seems based upon the view that the construction of wharves and the placing of sand, ballast and other like material in the navigable waters of a tide-water bay or harbor, is *per se* a nuisance in this State. We think this an error. " In England the right of property in tide waters and in the soil thereof is by the common law in the King, and the King, or in this country as a general rule the State, may abate every invasion thereon, whether the same be a nuisance to the navigation or not." Such an intrusion is denominated a purpresture, and while the old, writers say that it might be committed either against the King, the Lord of the Fee or any other subject, in its ordinary acception at the present day it means any encroachment upon the sovereign, either in highways, rivers or streets or harbors. Angell on Tide Waters, 199 ; Eden on Injunctions, 259 ; 2 Inst., 38, 272.

A wharf is therefore a purpresture, the construction of which was subject to sovereign control, and the deposit of stone or other like material in navigable waters was subject to like control by the State by virtue of its right to the soil and its duty to protect the commerce of the port or harbor. The sovereign here, the State of Florida, has declared that the building of wharves is for the benefit of commerce, and has authorized the construction of wharves generally in such ports or harbors and the deposit of proper material to fill up from the shore as far as may be desired, " not obstructing the channel, but leaving full space for the requirements of commerce."

The construction of a wharf and the filling up of the space between the shore line and the channel is therefore authorized, and the stoppage of the navigation of the heretofore navigable waters lying between the shore line and the channel becomes legal if it be of such nature as is con-

sistent with the limitation placed by the sovereign upon the authority given. From this the result follows that a plaintiff makes no case of nuisance by a simple allegation of the construction of a wharf and the deposit of material in the navigable waters of a bay or harbor, for those acts are authorized by the sovereign, and they do not become the subject of complaint at the suit, either of the State or any other party, unless they obstruct commerce. True, the riparian proprietor may object; not on the ground of nuisance, however, but by virtue of his right to the soil and his consequent exclusive right to build the wharf and make the deposit himself. He complains just as he would of any other improper appropriation or use of his property. We think plaintiff fails in the matter of making a case in this view. His allegations are not sufficient.

A few words generally upon this subject that the court may be fully understood.

Under the legislation of this State the navigation of tide waters of a bay between the line of the shore and the channel is made subordinate to the general commercial requirements of the port or harbor. Indeed it may be generally said that the law is that navigation, while a part of commerce, is subordinate to it. That which benefits commercee may decrease the facility for navigation. Filling in from the shore line to the channel on each side of a bay to that extent decreases the navigable area of such bay, but if it be a benefit to commerce by enabling vessels of heavy tonnage to have speedy discharge or otherwise the sovereign has authorized it and it is lawful. Says Holroyd, Justice, in The King vs. Russell, 6 Barn. & Cress., 270: "The right of the public upon the waters of a port or navigable river is not confined to the purposes of passage; trade and commerce are the chief objects, and the right of passage is chiefly subservient to those ends. Unless there are facili-

ties of loading and unloading of shipping and landing much of the benefit of a public port is lost. In the infancy of a port, when it is first applied to the purposes of trade and commerce, unless the water by the shore be deep, the articles must be shipped in shallow water from the shore and landed in shallow water on the shore. Boats or vessels of small draft must be employed to fetch and carry from and to the shore, and the commodity must pass from boat to ship or from ship to boat. Breakage and pilferage and waste, besides the expense of boating, are some of the probable concomitants of such a mode. As trade advances the inconvenience and mischief of this mode are suspended by the erection of wharves and quays, and what is perhaps an improved species of loading wharf, a staith.* The loading or unloading is then immediate from the wharf or staith into the ship or from the ship upon the wharf. But upon what principle can the erection of a wharf or staith be supported? It narrows the right of passage. It occupies a space where boats before had navigated. It turns part of the water way into solid ground; but it advances some of the other purposes, the main purpose of a port, its trade and commerce.

" Is there any other legal principle upon which they can be allowed? Make an erection for pleasure, for whim, for caprice, and if it interferes in the last degree with the public right of passage it is a nuisance. Erect it for the pur poses of trade and commerce, and keep it applied to the purposes of trade and commerce, the interests of trade and commerce give it a protection, and it is a justifiable erection, not a nuisance."

It results from what has been said that this case as presented upon the hearing of the bill and answer was not

---

* A staith is defined to be " the line of rails forming the extremity of a railway, and generally occurring next to navigable waters, being laid on platforms for discharging coal, &c., into vessels."

such as would justify awarding an injunction. The plaintiff in the Circuit Court, the respondent here, calls our attention to the rule that appellate tribunals as a general rule are loth to interfere with the exercise of this power by the Chancellor. In this we agree with him, but it must be obvious to one who understands this case as we do that the failure to exercise the power here would be its practical abdication.

The order granting an injunction is reversed and the case is remanded for further proceedings.